UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 11-2824-Turnoff

UNITED STATES OF AMERICA

vs.

JORGE GONZALEZ-ZULUETA,
ANTONIO HERNANDEZ-GALINDO,
DANIEL ABREU-JIMENEZ,
YOUANY OLIVERA-GARCIA
and
ARIEL VALDES,

        **Defendants.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes  __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes  __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____
KELLY S. KARASE
ASSISTANT UNITED STATES ATTORNEY
Court No. A5501183
H.I.D.T.A.
11200 N.W. 20th Street
Miami, Florida 33172
Telephone: (305) 715-7642/7655
Facsimile: (305) 715-7639
kelly.karase@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>JORGE GONZALEZ-ZULUETA,<br>ANTONIO HERNANDEZ-GALINDO,<br>DANIEL ABREU-JIMENEZ,<br>YOUANY OLIVERA-GARCIA and ARIEL VALDES,<br>*Defendant(s)* | )<br>)<br>)  Case No.  11-2824-Turnoff<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 24 through June 23, 2011,__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to possess with intent to distribute five or more kilograms of cocaine |
| 18 U.S.C. § 1951(a) | Conspiracy to interfere with interstate commerce by robbery |
| 18 U.S.C. § 924(c)(1)(A) | Possession of a firearm in furtherance of a crime of violence and a drug trafficking crime |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Jason Stankiewicz, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __06/24/2011__

*Judge's signature*

City and state: __Miami, Florida__    William C. Turnoff, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Jason Stankiewicz, Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (hereinafter "ATF") Miami, Florida, being duly sworn, depose and say:

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 3051.

2. I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and have been so employed for six years. Prior to being an ATF agent, I was a uniformed Police Officer for the United States Secret Service for one year. I am currently assigned to the Miami Field Division, ATF/HIDTA STOP Task Force. My responsibilities as a Special Agent include, among other things, conducting criminal investigations involving violations of Title 18 of the United States Code. As a Special Agent, I have participated in numerous investigations, including but not limited to, violations of federal firearms laws, federal explosives laws, arson laws, alcohol and tobacco diversion laws, as well as narcotics violations. More specifically, the HIDTA/STOP Task Force proactively conducts investigations related to violent crime to include home invasion robberies. In regards to home invasion investigations and other violent crime, I have become familiar with the methods, weapons, and tools utilized to conduct a home invasion robbery for narcotics, among other things. I have received training at the Federal Law Enforcement Training Center in all of the above violations, among other things.

3. The information in this Affidavit is based on my personal knowledge and information obtained from other sworn law enforcement officers. The information set forth here is provided solely for the purpose of establishing probable cause in support of a criminal complaint against Jorge GONZALEZ-ZULUETA, Antonio HERNANDEZ-GALINDO, Daniel ABREU-JIMENEZ, Ariel VALDES, and Youany OLIVERA-GARCIA for conspiring to possess with intent to distribute 5 kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; for conspiring to interfere with interstate commerce by robbery, in violation of Title 18, United States Code, Section 1951(a); and for possessing a firearm in furtherance of a crime of violence or drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A). Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not include all of the details of the investigation of which I am aware.

4. On May 24, 2011, law enforcement officers met with a cooperating defendant (CD-1) regarding the ongoing criminal activity of Jorge GONZALEZ-ZULUETA, a/k/a, "Jorgito." CD-1 stated that he/she first met GONZALEZ-ZULUETA in Cuba over 20 years ago. During that time, CD-1 established that GONZALEZ-ZULUETA and his associates had conducted numerous robberies in Cuba as well as the State of Florida. A records check revealed that GONZALEZ-ZULUETA entered the United States on July 22, 2009.

1

5. CD-1 advised that GONZALEZ-ZULUETA was associated with an active home invasion robbery crew of approximately three to four individuals based in Miami, Florida. CD-1 learned from GONZALEZ-ZULUETA that this robbery crew recently conducted a home invasion robbery in the area of Tampa, Florida, for a substantial amount of marijuana. GONZALEZ-ZULUETA told CD-1 that this robbery crew liked to rob drug houses and other residences with valuable jewelry and currency.

6. On this same date, at approximately 4:06 p.m., while in the presence of law enforcement officers, CD-1 placed a controlled/recorded telephone call to GONZALEZ-ZULUETA. This call was directed to setup a first undercover meeting with an ATF undercover law enforcement officer ("UC") on Wednesday, May, 25, 2011, to discuss plans to commit an armed home invasion robbery for kilograms of cocaine. During their conversation, GONZALEZ-ZULUETA wanted CD-1 to meet him on this date. However, CD-1 replied that he/she was unavailable and they made plans to meet the following day. CD-1 added that he/she would be bringing his/her "friend," (UC), who would provide the details regarding the robbery. Prior to the end of their conversation, GONZALEZ-ZULUETA agreed to speak with his associates later, and bring them to the meeting the next day.

## PLANNING THE ROBBERY

7. On May 25, 2011, the UC and CD-1 met with GONZALEZ-ZULUETA in the parking lot of a shopping plaza in Miami, Florida, to discuss details regarding a potential home invasion robbery for cocaine. At approximately 3:04 p.m., GONZALEZ-ZULUETA, accompanied by an unknown female, entered the UC's vehicle. The UC explained to GONZALEZ-ZULUETA that he was a disgruntled drug courier looking for a crew to commit an armed robbery of a "stash house," for approximately 10-15 kilograms of cocaine. Subsequently, GONZALEZ-ZULUETA placed a cellular telephone call to an individual he called "DANIEL" LNU, later identified as Daniel ABREU-JIMENEZ. After a brief conversation, GONZALEZ-ZULUETA indicated to the UC that his associates were at El Palacio de Los Jugos (Juice Palace), located at 5721 W Flagler Street, Miami, Florida, and wanted the UC to drive to that location to meet them. The UC informed GONZALEZ-ZULUETA that he would be unable drive to that location, but wanted to know if they could meet later in the evening.

8. Prior to the end of the meeting, the UC asked GONZALEZ-ZULUETA if his associates had firearms and were capable of committing a home invasion style robbery. GONZALEZ-ZULUETA confirmed these individuals were in possession of firearms and recently committed an armed robbery of a marijuana grow house in the Tampa, Florida area. After an additional call from GONZALEZ-ZULUETA to ABREU-JIMENEZ, GONZALEZ-ZULUETA and the UC agreed to reschedule the meeting with the additional associates.

9. On May 26, 2011, the UC, along with an additional UC acting as backup (UC-2), picked up GONZALEZ-ZULUETA from his residence in Miami, Florida, to further discuss the home invasion robbery for cocaine. During the car ride, GONZALEZ-ZULUETA informed the UC that he had spoken to his associates and informed them that the robbery would take place at a residence where kilograms of cocaine would be present. Shortly thereafter, the UC arrived at the El Palacio De Los Jugos. After their arrival, GONZALEZ-ZULUETA spoke to ABREU-JIMENEZ. GONZALEZ-ZULUETA learned that ABREU-JIMENEZ was waiting on his partner. The UC spoke with ABREU-JIMENEZ on GONZALEZ-ZULUETA'S cellular telephone and, after a brief conversation, the UC and ABREU-JIMENEZ agreed to reschedule their pre-arranged meeting for the following week.

10. On June 9, 2011, the UC, along with an additional UC acting as backup (UC-3), picked up GONZALEZ-ZULUETA from his residence. During the car ride, GONZALEZ-ZULUETA provided the UC with ABREU-JIMENEZ's cellular telephone number. The UC placed a recorded call to ABREU-JIMENEZ and they arranged to meet in the parking lot of a Winn Dixie in Miami, Florida. After some time, ABREU-JIMENEZ, and another individual, later identified as HERNANDEZ-GALINDO, approached the UC.

11. The UC explained that he was a disgruntled drug courier who was looking for a crew to commit an armed robbery of a stash house where 10-15 kilograms of cocaine would be present. ABREU-JIMENEZ explained that there would be two (2) individuals entering the "stash house," one of which would be HERNANDEZ-GALINDO, and another unknown individual. The UC explained that at least one (1) of the individuals inside the house would be armed. HERNANDEZ-GALINDO advised the UC that he didn't need to worry about the armed individual(s) since HERNANDEZ-GALINDO and the crew were professionals. ABREU-JIMENEZ and HERNANDEZ-GALINDO asked additional questions to the UC regarding the location of the "stash house," the amount of cocaine, and further reassured the UC about the quality and professional nature of their crew. Upon completion of the meeting, ABREU-JIMENEZ, and HERNANDEZ-GALINDO were observed leaving in a maroon-colored Toyota, registered to HERNANDEZ-GALINDO.

12. During the week of June 13, 2011, the UC and GONZALEZ-ZULUETA exchanged recorded phone calls and text messages regarding the date and time of the planned home invasion robbery. The UC advised GONZALEZ-ZULUETA that the robbery would occur during the following week but was able to arrange a meeting for June 21, 2011.

13. On June 21, 2011, the UC, along with an ATF Confidential Informant (CI), met with GONZALEZ-ZULUETA, ABREU-JIMENEZ, HERNANDEZ-GALINDO, and another male later identified as R.P., in the parking lot of the Sports Authority (Dolphin Mall), Miami, Florida. During the meeting, the UC explained to R.P. and again to the others that he was a disgruntled drug courier who was looking for a crew to rob his employer of 10-15 kilograms of cocaine. During their conversation, R.P. stated that "entering a house is ten years, and having a gun is five years…I have a friend locked up for this." Upon completion of the meeting, R.P. advised that he did not wish to participate in this crime.

Later in the conversation, ABREU-JIMENEZ, advised that "once you point a gun at someone they won't move." HERNANDEZ-GALINDO advised the element of surprise would be the key to this crime, and proceeded to ask the UC if the crew could follow the UC as he entered the "stash house." Prior to the end of the meeting, ABREU-JIMENEZ advised the UC that he would recruit two additional individuals to participate in this robbery.

## THE ATTEMPTED ROBBERY

14. On June 23, 2011, from approximately 12:35 p.m. - 2:33 p.m., GONZALEZ-ZULUETA sent several text messages to the UC regarding the robbery. The UC replied on multiple occasions that he wanted GONZALEZ-ZULUETA to call him after he left his place of work for the day. At approximately 2:57 p.m., the UC placed a recorded/return phone call to GONZALEZ-ZULUETA. During their conversation, GONZALEZ-ZULUETA advised that he and his crew would be ready for the robbery later this evening; the UC stated that he would call back around 7:00 p.m. At approximately 7:13 p.m., and 7:15 p.m., the UC placed recorded calls to GONZALEZ-ZULUETA. During these conversations, the UC advised that he and his cousin (CI) were ready for the robbery crew. GONZALEZ-ZULUETA replied that he and his associates would meet the CI at the El Tropico Restaurant located at 7930 NW 36th Street, Miami, Florida.

15. At approximately 7:24 p.m., the CI placed a directed/recorded call to GONZALEZ-ZULUETA to advise of his/her location and vehicle description. Shortly thereafter at 7:27 p.m., surveillance units observed GONZALEZ-ZULUETA, HERNANDEZ-GALINDO, and ABREU-JIMENEZ arrive at the El Tropico Restaurant in the maroon, Toyota Camry registered to HERNANDEZ-GALINDO. These individuals walked over to the CI vehicle and engaged the CI in conversation regarding the robbery and two additional individuals, later identified as Ariel VALDES, and Youany OLIVERA-GARCIA. ABREU-JIMENEZ was reportedly in telephonic contact with OLIVERA-GARCIA. At approximately 7:48 p.m., one of the three individuals, believed to be ABREU-JIMENEZ, advised the CI that the two additional subjects were on the way with the "cold steel," a commonly used term for firearms. At approximately 8:29 p.m., surveillance observed VALDES and OLIVERA-GARCIA arrive in a white, Jaguar vehicle. The five individuals confirmed they were ready and willing to commit the home invasion robbery and were in possession of their firearms. The CI then drove GONZALEZ-ZULUETA and ABREU-JIMENEZ to the pre-determined arrest location, while HERNANDEZ-GALINDO, VALDES, and OLIVERA-GARCIA followed in the white Jaguar.

16. At approximately 8:45 p.m., law enforcement officers placed Jorge GONZALEZ-ZULUETA, Antonio HERNANDEZ-GALINDO, Daniel ABREU JIMENEZ, Ariel VALDES, and Youany OLIVERA-GARCIA into custody without incident. The scene was secured and processed by the ATF/STOP HIDTA Task Force.

17. At approximately 8:56 p.m., a search incident to arrest of OLIVERA-GARCIA recovered the following items: (1) pair of steel handcuffs located in his left, rear pants pocket, (1) knife located in his right, front pants pocket, and (1) cell phone located in his left, front pants pocket.

18. At approximately 9:18 p.m., a search incident to arrest of VALDES recovered the following item: (1) cell phone located in his left, front pants pocket. At approximately 9:33 p.m., a search incident to arrest of HERNANDEZ-GALINDO recovered the following item: (1) cell phone located in his right, front shorts pocket. No evidentiary items were recovered on ABREU-JIMENEZ or GONZALEZ-ZULUETA.

19. At approximately 9:48 p.m., a search of the white Jaguar revealed, among other things, the following items: (3) pairs of flex-cuffs recovered from the rear pocket of the front driver side seat within a yellow plastic Sedano's bag; (1) dark-colored wig recovered from rear driver side floor board within an "Orange Fashions" plastic bag; (1) Taurus, Model: 85 Ultra-light, .38 caliber revolver, bearing serial number AW78019, recovered from the rear pocket of front passenger side seat wrapped in a gray t-shirt; (5) rounds of Federal .38 caliber ammunition, loaded within aforementioned Taurus revolver; (1) gold badge in badge holder recovered from the rear pocket of front passenger side seat; (1) Glock, Model 23, .40 caliber semi-automatic pistol, bearing serial number CHN363US, wrapped in red plastic bag, recovered from glove compartment; (12) assorted rounds of ammunition loaded in magazine of aforementioned Glock; (1) role of packing tape recovered from glove compartment; (1) black crowbar recovered from trunk;

20. GONZALEZ-ZULUETA was interviewed after his arrest. After being advised of and waiving his *Miranda* rights, GONZALEZ-ZULUETA gave statements admitting his full participation and involvement in the crime.

21. HERNANDEZ-GALINDO was interviewed after his arrest. After being advised of and waiving his *Miranda* rights, HERNANDEZ-GALINDO gave statements admitting his participation in the conspiracy.

22. ABREU-JIMENEZ was interviewed after his arrest. After being advised of and waiving his *Miranda* rights, ABREU-JIMENEZ gave statements admitting his participation and involvement in the crime.

23. VALDES was interviewed after his arrest. After being advised of and waiving his *Miranda* rights, VALDES gave statements admitting his participation and involvement in the crime.

## CONCLUSION

24. Based on the forgoing, I respectfully submit that there is probable cause to arrest Jorge GONZALEZ-ZULUETA, Antonio HERNANDEZ-GALINDO, Daniel ABREU JIMENEZ, Ariel VALDES, and Youany OLIVERA-GARCIA for conspiring to possess with intent to distribute 5 kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; for conspiring to interfere with interstate commerce by robbery, in violation of Title 18, United States Code, Section 1951(a); and for possessing a firearm in furtherance of a crime of violence or drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
JASON STANKIEWICZ, SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS & EXPLOSIVES

Sworn and subscribed before
me this 24th day of June, 2011

_____
WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE